[Cite as *State v. Chambers*, 2011-Ohio-1305.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
HANCOCK COUNTY


STATE OF OHIO,                                    CASE NO. 5-10-29

   PLAINTIFF-APPELLEE,

 v.

ISHMIAL K. CHAMBERS,                      O P I N I O N

   DEFENDANT-APPELLANT.


Appeal from Hancock County Common Pleas Court
Trial Court No. 2009-CR-0217

Judgment Affirmed

Date of Decision:  March 21, 2011


APPEARANCES:

   *Scott B. Johnson* **for Appellant**

   *Alex K. Treece* **for Appellee**

**PRESTON, J.**

{**¶1**} Defendant-appellant, Ishmial K. Chambers (hereinafter "Chambers"), appeals the Hancock County Court of Common Pleas' decision overruling his motion to suppress evidence seized as the result of a traffic stop. We affirm.

{**¶2**} On October 19, 2009, Trooper Kurt Beidelschies of the Ohio State Highway Patrol stopped Chambers on southbound U.S. Interstate 75 ("I-75") following a probable violation of R.C. 4511.33. (June 2, 2010 Tr. at 8-12). A canine from the Hancock County Sheriff's Office alerted on Chambers' vehicle, and a subsequent search of the vehicle's trunk revealed several bags of marijuana and a baseball-sized bag of cocaine. (Id. at 17-18).

{**¶3**} On October 20, 2009, the Hancock County Grand Jury indicted Chambers on one count of possession of cocaine in violation of R.C. 2925.11(A). (Doc. No. 1). On October 28, 2009, Chambers pled not guilty and was released on bond. (Doc. No. 5). A pretrial was scheduled for November 6, 2009. (Id.).

{**¶4**} On November 6, 2009, the case was continued to allow Chambers time to file a motion to suppress evidence seized as a result of the traffic stop. (Doc. No. 10). On December 1, 2009, Chambers filed his motion to suppress alleging that: (1) there was no probable cause, nor clear articulable facts to stop his vehicle; (2) there was no probable cause, nor clear articulable facts to justify his continued detention beyond the time necessary to issue a minor traffic citation; (3)

there was no factual basis to justify his continued detention while a canine unit was summoned; and (4) there was no probable cause for the search of his vehicle. (Doc. No. 12).

{¶5} On June 2, 2010, the trial court held a hearing on the motion and, afterwards, took the matter under advisement. (Doc. No. 49). On July 16, 2010, the trial court held a hearing to announce its decision on the motion. (Doc. No. 61). The trial court overruled Chambers' motion to suppress at the hearing, and filed its decision noting the same on July 23, 2010. (Id.).

{¶6} On September 13, 2010, Chambers withdrew his previously tendered plea of not guilty and entered a plea of no contest to the indictment. (Doc. No. 70). Thereafter, the trial court found Chambers guilty and sentenced him to five (5) years of incarceration. (Doc. No. 72).

{¶7} On October 1, 2010, Chambers filed a notice of appeal. (Doc. No. 95). Chambers now appeals raising one assignment of error for our review.

**ASSIGNMENT OF ERROR**

**THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED PURSUANT TO A *DE MINIMUS* TRAFFIC STOP WHERE THERE WAS NO PRIOR OR CONCURRENT EVIDENCE OF CRIMINAL ACTIVITY.**

{¶8} In his first assignment of error, Chambers argues that the fact he slowed his vehicle to fifty-seven miles per hour (57 M.P.H.) in a sixty-five mile-

per-hour (65 M.P.H.) zone and that he was a person of color did not provide Trooper Beidelschies with probable cause to stop his vehicle. Additionally, Chambers argues that Trooper Beidelschies did not have further indicia of criminal activity to justify his further expansion of the traffic stop, i.e. to request canine assistance.

{¶9} A review of the denial of a motion to suppress involves mixed questions of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. Id., citing *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972.

{¶10} When reviewing a ruling on a motion to suppress, deference is given to the trial court's findings of fact so long as they are supported by competent, credible evidence. *Burnside*, 2003-Ohio-5372, at ¶8. With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must decide whether the facts satisfy the applicable legal standard. *State v. McNamara* (1997), 124 Ohio App.3d 706, 710, 707 N.E.2d 539.

{¶11} Trooper Kurt Beidelschies of the Ohio State Highway Patrol, Findlay Post 32, testified that he was parked in a marked cruiser facing southbound I-75 traffic while working from 11:00 p.m. to 7:00 a.m. on October 19, 2009. (June 2,

2009 Tr. at 8-10). Trooper Beidelschies testified that he observed Chambers rapidly slow down to fifty-seven miles per hour (57 M.P.H.) while passing his parked cruiser traveling southbound on I-75, even though no other traffic was around Chambers' vehicle at the time. (Id. at 10). Trooper Beidelschies testified that he pulled out behind Chambers' vehicle and observed Chambers driving extremely close (within a tire's width) to the solid white edge line. (Id.). Trooper Beidelschies further testified that Chambers drifted over the white edge line twice by a tire's width each time, so he initiated a traffic stop for a marked lanes violation. (Id. at 10-11).

{¶12} Trooper Beidelschies approached Chambers' vehicle, informed him of the reason for the stop, and requested Chambers' driver's license, registration, and proof of insurance. (Id.). Chambers provided Trooper Beidelschies his license, but produced several rental agreements for the car instead of the registration. (Id. at 12). Some of the rental agreements had Chambers' name on them and others did not, so Trooper Beidelschies requested that Chambers have a seat in the front of his cruiser to sort through the paperwork. (Id. at 12-13). Among the several agreements Chambers provided, Trooper Beidelschies located a rental agreement from Hertz rental service in Patricia Board's name that listed Chambers as an additional driver. (Id. at 13). Trooper Beidelschies contacted dispatch in order to verify the rental agreement. (Id.). Trooper Beidelschies

testified that Chambers informed him that he had left Owensboro, Kentucky that day to drive to Detroit, Michigan to drop off his nephew at his grandmother's house, and that he was returning to Owensboro, Kentucky. (Id. at 14). Chambers also told Trooper Beidelschies that he rented the car to drive from Kentucky to Michigan to drop off his nephew because his car was broken down and had been overheating. (Id.). Trooper Beidelschies testified that he found this "confusing" given that the rental agreement covered several days (Oct. 16-20), and Chambers had expressed to him how extremely expensive it was to rent vehicles. (Id.). Trooper Beidelschies also testified that he was "confused" why the car was rented by individuals associated with Chambers long before October 16, 2009. (Id. at 15).

{¶13} Trooper Beidelschies testified that he ran a LEADS check on Chambers' driver's license, and that it can take longer to process an out-of-state license, such as Chambers' Kentucky driver's license. (Id.). Trooper Beidelschies further testified that he talked with Travar Board, Chambers' step-son and a passenger in the vehicle, about their travel. (Id. at 12, 14, 16). Board told Trooper Beidelschies that he had been in Michigan for about a week for a funeral, and that his aunt had driven him from Kentucky to Michigan. (Id. at 16). Board told Trooper Beidelschies that he did not know how Chambers arrived in Michigan. (Id.). Trooper Beidelschies testified that Board's story conflicted with Chambers' story, because Chambers indicated that Board accompanied him from Kentucky to

Michigan to drop off his nephew. (Id.). Trooper Beidelschies also testified that Chambers appeared nervous when he was talking with him in the cruiser, and that Board was even more nervous than Chambers. (Id.). When Board reached his hand out to retrieve his driver's license, his hand was visibly shaking and his voice was shaky, according to Trooper Beidelschies. (Id.). After discovering the two conflicting stories and witnessing this nervous behavior, Trooper Beidelschies contacted the Hancock County Sheriff's Office and requested canine assistance. (Id. at 17).

{¶14} Deputy Smith and canine, Becky, arrived approximately five (5) minutes later and alerted on Chambers' vehicle. (Id. at 17-18). At that point in time, Trooper Beidelschies explained to Chambers and Board that they were under investigative detention and placed them in the back seat of his cruiser. (Id. at 18). Trooper Beidelschies testified that they located numerous bags of marijuana and a baseball-sized bag of cocaine in a bag of dirty clothes in the vehicle's trunk. (Id.). At that time, Trooper Beidelschies returned to his cruiser and informed Chambers and Board of their *Miranda* rights, and asked the two of them about the drugs. (Id.). At first, both men denied knowledge of the drugs, but Chambers later admitted that the drugs belonged to him, and he did not want his step-son, Board, to get into trouble for what he had inside the vehicle. (Id.). Trooper Beidelschies

testified that it took approximately fifteen (15) minutes from the time he stopped Chambers' vehicle until the canine alerted. (Id. at 19).

{¶15} On cross-examination, Trooper Beidelschies testified that his cruiser was facing west so he could see southbound traffic, and he had his spotlight illuminating the roadway. (Id. at 19-20). Trooper Beidelschies testified that the purpose of using the spotlight was to determine the number of occupants in the vehicle for officer safety. (Id. at 20). He further testified that the use of the spotlight was a standard operating procedure. (Id. at 25). Trooper Beidelschies could not recall how many leasing companies were on the agreements that Chambers provided, nor could he recall the number of lease agreements that Chambers provided. (Id. at 20-21). Trooper Beidelschies also could not recall whether Chambers' driving status came back valid prior or subsequent to his call for canine assistance. (Id. at 21). He did not copy all of the lease agreements but only the valid lease agreement, which he identified and which was marked as defendant's exhibit A. (Id. at 22, 25, 40). Trooper Beidelschies testified that Chambers' speed was not the reason for the stop, but that Chambers' rapid deceleration was an indication of possible impairment, which is why he decided to follow Chambers. (Id. at 26, 27). Trooper Beidelschies testified that he did not witness Chambers' vehicle weaving from side to side, fishtailing, or driving erratically, nor did he smell an odor of alcoholic beverage upon Chambers or

witness any signs of impairment during the stop. (Id. at 27). Trooper Beidelschies testified that he followed Chambers for approximately two (2) miles and witnessed Chambers drift over the white edge line by a tire's width twice. (Id. at 28). He further testified that he did not observe any drugs or drug paraphernalia in plain sight in the vehicle when he shined his light into Chambers' vehicle. (Id. at 29-30). Trooper Beidelschies testified that the video recording system for his cruiser was not working that evening. (Id. at 32). When asked whether dispatch informed him that the rental agreement from Hertz was valid prior to him calling for canine assistance, Trooper Beidelschies testified, "[p]erhaps, but I doubt it, because typically * * * there is a delay between the time our dispatch calls Hertz and Hertz is able to pull up the information." (Id. at 35).

{¶16} On re-direct examination, Trooper Beidelschies testified that he initiates between ten to fifteen (10-15) traffic stops each work night, each averaging between fifteen to twenty (15-20) minutes in duration. (Id. at 38). Trooper Beidelschies testified that, generally, numerous rental agreements, multiple occupants, nervous behavior by occupants of a vehicle, and conflicting stories all can prolong the duration of a traffic stop. (Id. at 38-39).

{¶17} Hancock County Sheriff's Deputy Fred Smith testified that he was working on October 19, 2009 with his canine, Becky, who is trained and certified for detection of marijuana, cocaine, methamphetamine, heroin, and their

derivatives. (Id. at 41-43). Deputy Smith testified that canine assistance was requested for southbound I-75 at mile marker 155. (Id. at 43-44). Deputy Smith testified that he arrived at the scene six (6) minutes after receiving the dispatch. (Id. at 44). He testified that his canine, Becky, indicated on the passenger side rear door of Chambers' vehicle before Becky even made it around the entire vehicle. (Id. at 44-45). Deputy Smith further testified that Trooper Beidelschies discovered marijuana and cocaine in the trunk of Chambers' vehicle during the search. (Id. at 45). On cross-examination, Deputy Smith testified that he has been a dog handler since 2001, and he was certified with Becky in 2005. (Id. at 46). Deputy Smith testified that there have been "very few" times when Becky has falsely indicated, only when a distraction odor with his scent or somebody's scent that Becky would be familiar with was used. (Id. at 47-48). On re-direct, Deputy Smith testified that he received the call for canine assistance at 2:02 a.m. and arrived on scene at 2:08 a.m. (Id. at 49).

{¶18} We now turn to Chambers' arguments. Chambers first argues that the fact he slowed his vehicle to fifty-seven miles per hour (57 M.P.H.) in a sixty-five mile-per-hour (65 M.P.H.) zone did not provide Trooper Beidelschies with probable cause to stop his vehicle.

{¶19} In order to constitutionally stop a vehicle, an officer must, at a minimum, have either: (1) a reasonable suspicion, supported by specific and

-10-

articulable facts, that criminal behavior has occurred, is occurring, or is imminent; or (2) a reasonable suspicion, supported by specific and articulable facts, that the vehicle should be stopped in the interests of public safety. *State v. Moore*, 3d Dist. No. 9-07-60, 2008-Ohio-2407, ¶10, citing *State v. Andrews*, 3d Dist. No. 2-07-30, 2008-Ohio-625, ¶8, citing *State v. Chatton* (1984), 11 Ohio St.3d 59, 61, 463 N.E.2d 1237, certiorari denied by 469 U.S. 856, 105 S.Ct. 182, 83 L.Ed.2d 116; *State v. Purtee*, 3d Dist. No. 8-04-10, 2006-Ohio-6337, ¶9, citing *State v. Norman* (1999), 136 Ohio App.3d 46, 53-54, 735 N.E.2d 453.

{¶20} An officer's "reasonable suspicion" is determined based on the totality of the circumstances. *Moore*, 2008-Ohio-2407, at ¶11, citing *Andrews*, 2008-Ohio-625, at ¶8, citing *State v. Terry* (1998), 130 Ohio App.3d 253, 257, 719 N.E.2d 1046, citing *State v. Andrews* (1991), 57 Ohio St.3d 86, 87, 565 N.E.2d 1271. "'Specific and articulable facts' that will justify an investigatory stop by way of reasonable suspicion include: (1) location; (2) the officer's experience, training or knowledge; (3) the suspect's conduct or appearance; and (4) the surrounding circumstances." *Purtee*, 2006-Ohio-6337, at ¶9, citing *State v. Gaylord*, 9th Dist. No. 22406, 2005-Ohio-2138, ¶9, citing *State v. Bobo* (1988), 37 Ohio St.3d 177, 178-79, 524 N.E.2d 489.

{¶21} Trooper Beidelschies testified that he began to follow Chambers after he noticed Chambers decelerate very rapidly as Chambers approached his parked

cruiser, because he was concerned that Chambers was driving impaired. (June 2, 2010 Tr. at 26-27). Trooper Beidelschies further testified that he did not stop Chambers because of his speed, but because Chambers crossed over the white edge line twice. (Id. at 10-11). "[A] traffic stop is constitutionally valid when a law-enforcement officer witnesses a motorist drift over the [right white edge line] in violation of R.C. 4511.33, even without further evidence of erratic or unsafe driving." *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶25. See, also, *State v. Burwell*, 3d Dist. No. 12-09-06, 2010-Ohio-1087, ¶11; *State v. Anthony*, 3d Dist. No. 13-09-26, 2009-Ohio-6717, ¶¶12-14. After witnessing Chambers cross over the white edge line, Trooper Beidelschies had probable cause, and thus a reasonable articulable suspicion, that Chambers violated R.C. 4511.33; and therefore, the stop was constitutionally valid. *Mays* at ¶¶21, 24; *Burwell* at ¶11; *Anthony* at ¶13

{¶22} Chambers also argues that the fact that he was a person of color did not provide Trooper Beidelschies with probable cause to initiate the traffic stop. Although we generally agree with Chambers' proposition of law, the trial court, as trier of fact, specifically found that the record lacked sufficient evidence that Chambers' race played a role in initiating the traffic stop. (July 16, 2010 Tr. at 18-19). Additionally, even if this Court were to assume that Trooper Beidelschies initiated the traffic stop based upon Chambers' race, that fact does not affect the

reasonableness of the stop for Fourth Amendment purposes. As the Ohio Supreme Court has noted, "[w]here a police officer stops a vehicle based on probable cause that a traffic violation has occurred or was occurring, the stop is not unreasonable under the Fourth Amendment to the United States Constitution even if the officer had some ulterior motive for making the stop[.]" *Dayton v. Erickson* (1996), 76 Ohio St.3d 3, 665 N.E.2d 1091, syllabus. See, also, *Whren v. U.S.* (1996), 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 ("We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *U.S. v. Bullock* (C.A. 4, 1996), 94 F.3d 896, 899 (law enforcement's alleged racial motivation for traffic stop is irrelevant to the legitimacy of the stop under Fourth Amendment); *U.S. v. Navarro-Camacho* (C.A. 6, 1999), 186 F.3d 701, 705 (same); *U.S. v. Robinson* (C.A. 7, 2003), 314 F.3d 905, 907 (same); *U.S. v. Gomez Serena* (C.A. 8, 2004), 368 F.3d 1037, 1041 (same); *U.S. v. Adkins* (C.A. 10, 2001), 1 Fed. Appx. 850 (same); *State v. Harden*, 2nd Dist. No. 19880, 2004-Ohio-664, ¶11 (same). Since Trooper Beidelschies had probable cause to conclude that Chambers violated R.C. 4511.33, the traffic stop was reasonable, and Trooper Beidelschies' ulterior motives, if any, are irrelevant.

Furthermore, even if Chambers' race motivated Trooper Beidelschies to initiate the traffic stop, suppression of the evidence seized during the traffic stop is not an available remedy. *U.S. v. Nichols* (C.A. 6, 2008), 512 F.3d 789, 794, overruled on other grounds by *U.S. v. Buford* (C.A. 6, 2011), ___ F.3d ___, 2011 WL 447048. See, also, *U.S. v. Chavez* (C.A. 5, 2002), 281 F.3d 479, 486-87 (suppression of evidence is not an available remedy for violations of Fifth or Fourteenth Amendments). For these reasons, we must reject Chambers' argument that the trial court erred by overruling his motion to suppress based upon alleged racial profiling.

{¶23} Finally, Chambers argues that Trooper Beidelschies did not have further indicia of criminal activity to justify his further expansion of the traffic stop, i.e. to request canine assistance.

{¶24} "'[W]hen detaining a motorist for a traffic violation, an officer may delay a motorist for a time period sufficient to issue a ticket or a warning.'" *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶12, quoting *State v. Keathley* (1988), 55 Ohio App.3d 130, 131, 562 N.E.2d 932. See, also, *State v. Whitman*, 184 Ohio App.3d 733, 2009-Ohio-5647, 922 N.E.2d 293, ¶11. "This measure includes the period of time sufficient to run a computer check on the driver's license, registration, and vehicle plates." *Batchili* at ¶12, citing *State v. Bolden*, 12th Dist. No. CA2003-03-007, 2004-Ohio-184, ¶17, citing *Delaware v.*

*Prouse* (1979), 440 U.S. 648, 659, 99 S.Ct. 1391, 59 L.Ed.2d 660. Further, "'[i]n determining if an officer completed these tasks within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation.'" *Batchili* at ¶12, quoting *State v. Carlson* (1995), 102 Ohio App.3d 585, 598-99, 657 N.E.2d 591, citing *State v. Cook* (1992), 65 Ohio St.3d 516, 521-22, 605 N.E.2d 70, and *U.S. v. Sharpe* (1985), 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605.

{¶25} "The use of a drug-detection dog does not constitute a "search," and an officer is not required, prior to a dog sniff, to establish either probable cause or a reasonable suspicion that drugs are concealed in a vehicle." *Whitman*, 2009-Ohio-5647, at ¶9, citing *Illinois v. Caballes* (2005), 543 U.S. 405, 409, 125 S.Ct. 834, 160 L.Ed.2d 842; *United States v. Place* (1983), 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110; *Carlson*, 102 Ohio App.3d at 594; *United States v. Seals* (C.A.5, 1993), 987 F.2d 1102, 1106. A law enforcement officer needs no suspicion or cause to "run the dog around" a stopped vehicle if he does it contemporaneously with the legitimate activities associated with the traffic violation. *Whitman*, 2009-Ohio-5647, at ¶9, citing *Caballes*, 543 U.S. at 409.

{¶26} The record herein demonstrates that Chambers' vehicle was lawfully detained based upon probable cause of a violation of R.C. 4511.33. The record

herein further demonstrates that Trooper Beidelschies requested canine assistance while he was verifying Chambers' authorization to drive the rental vehicle from the multiple Hertz rental agreements Chambers provided him and checking Chambers' driver's license. Therefore, Trooper Beidelschies was permitted to run the canine around the Chambers' vehicle without any reasonable suspicion that drugs were concealed in the vehicle, contrary to Chambers' argument. *Whitman*, 2009-Ohio-5647, at ¶9, citations omitted. Furthermore, the record reflects that the canine arrived on the scene five to six (5-6) minutes after Trooper Beidelschies requested canine assistance, and the total duration from the initial traffic stop to the canine alerting was fifteen (15) minutes. Although not specifically mentioned by the trial court, the five-to-six-minute wait for the canine to arrive was not unreasonable. See, e.g., *State v. French*, 9th Dist. No. 24252, 2009-Ohio-2342, ¶18 (10 minute wait was reasonable); *State v. Ramirez*, 9th Dist. No. 04CA0024-M, 2004-Ohio-6541, ¶¶11-12 (26 minute wait was reasonable); *State v. French* (1995), 104 Ohio App.3d 740, 748, 663 N.E.2d 367 (45 minute wait was reasonable). The trial court did conclude that a fifteen-minute traffic stop was reasonable in light of the multiple rental agreements Chambers presented and the time needed to verify whether Chambers had a lawful right to operate the rented motor vehicle at the time. (June 16, 2010 Tr. at 12). We agree with the trial court that fifteen (15) minutes was not an unreasonable amount of time to detain

Chambers for the traffic stop. In fact, Trooper Beidelschies testified that traffic stops average between fifteen to twenty (15-20) minutes each. (June 2, 2009 Tr. at 38). See e.g. *State v. Bordieri*, 6th Dist. No. L-04-1321, 2005-Ohio-4727, ¶21, citing *State v. Cook* (1992), 65 Ohio St.3d 516, 605 N.E.2d 70 (15 minutes reasonable). See also, *Sharpe*, 470 U.S. at 687. (20 minute detention reasonable when investigation was diligent and reasonable). For all these reasons, we must reject Chambers' argument that the trial court erred in overruling his motion to suppress evidence because of an impermissible lengthy detention.

{¶27} Chambers' assignment of error is, therefore, overruled.

{¶28} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, J., concurs.**

**ROGERS, P.J., concurs in Judgment Only.**

**/jnc**